UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,

   Plaintiff,

       v.

U.S. DEPARTMENT OF JUSTICE,

   Defendant.

Civil Action No. 22-1034 (BAH)

## DECLARATION OF JOSEPH E. BENDER, JR.

I, Joseph E. Bender, Jr., declare as follows:

1.    I am currently serving as the Acting Section Chief (A/SC) of the Record/Information Dissemination Section (RIDS), Information Management Division (IMD), Federal Bureau of Investigation (FBI), Winchester, Virginia. I have served in this capacity since March 6, 2023. When not serving as the A/SC, I am an Assistant Section Chief (ASC) in RIDS and have served in that position since December 2020. I joined the FBI in October 2003 and, prior to my current position, I was an Acting ASC in RIDS from June 2020 to December 2020; Unit Chief, RIDS National Security Unit, from January 2017 to June 2020; and an Assistant General Counsel (2003-2006) and Unit Chief (2006-2017), FBI Office of the General Counsel, National Security and Cyber Law Branch. In those capacities, I provided legal support to operational units of the FBI's National Security Branch. Prior to joining the FBI, I served as a trial attorney in the U.S. Department of Justice, Tax Division, Southern Criminal Enforcement Section. In that role, I participated in federal criminal enforcement prosecutions. I am an

1

attorney licensed in North Carolina and the District of Columbia.

2.      In my official capacity as A/SC of RIDS, I supervise approximately 238 FBI employees, supported by approximately 103 contractors, who staff a total of nine Federal Bureau of Investigation Headquarters (FBIHQ) units and two field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the Freedom of Information Act (FOIA) as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act (PA) of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

3.      Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of the FBI's handling of Plaintiff's FOIA request that is the subject of this litigation.

4.      The FBI submits this second declaration in response to Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment (hereafter referred to as "Plaintiff's Opposition" (ECF No. 18)). This declaration supplements, and incorporates by reference, the information provided in the declaration of Michael G. Seidel, dated February 24, 2023, and the exhibits attached thereto (hereafter referred to as "Seidel Declaration" (ECF No. 16-1)), and is

submitted in further support of Defendant's Motion for Summary Judgment (ECF No. 16) and in support of Defendant's Reply (filed herewith).

DISCREPANCY BETWEEN THE FBI'S INITIAL AND FINAL DETERMINATIONS ON THE EXISTENCE OF RESPONSIVE RECORDS

5. As explained in the Seidel Declaration, when the FBI initially received the FOIA request in November 2021, the FBI interpreted the request to be seeking records pertaining to Project Veritas, James O'Keefe, and Spencer Meads. Seidel Decl. ¶ 21.[1] However, the FBI did not search for records pertaining to James O'Keefe and Spencer Meads, because the FOIA request did not contain a signed privacy waiver or proof of death for either individual. Through that search, the FBI located one pending file associated with Project Veritas and conveyed this information to Plaintiff in a letter, dated December 15, 2021, wherein the FBI also stated that the investigative file is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A). *See* Seidel Decl. ¶¶ 8, 19.

6. After Plaintiff filed the complaint, the FBI reviewed the request again and realized that an error had been made in the initial interpretation of the FOIA request. Thus, the FBI searched for *communications* between the specific FBI officials delineated in the FOIA request and *The New York Times* employees, contractors, or representatives regarding search warrants for James O'Keefe's and Spencer Mead's residences. *See* Seidel Decl. ¶¶ 21-23. In addition, an FBI employee reviewed the pending file related to Project Veritas page-by-page for

---

[1] Paragraph 14 in the Seidel Declaration was inadvertently misworded. Paragraph 14 describes the FBI's subsequent interpretation of Plaintiff's FOIA request and not the initial interpretation. As stated in the Seidel Declaration, initially, the FBI interpreted the FOIA request as a request for records pertaining to Project Veritas, James O'Keefe, and Spencer Meads, instead of as a request for *communications* between FBI officials and employees, contractors, and representatives of *The New York Times* regarding search warrants and raids on O'Keefe's and Meads's residences. Seidel Decl. ¶ 21.

the requested communications and did not locate any. *See* Seidel Decl. ¶ 21. Thus, that file is not responsive to the FOIA request, which is evidence that the FBI's initial letter to Plaintiff invoking 5 U.S.C. § 552(b)(7)(A) was sent in error. Instead, the FBI should have sent a "No Records" letter in response to Plaintiff's FOIA request.

## THE FBI SEARCHED LOCATIONS REASONABLY LIKELY TO CONTAIN POTENTIALLY RESPONSIVE RECORDS

7. With Plaintiff's Opposition, Plaintiff filed an exhibit, Exhibit 4, redacted to remove personal identifying information, that it described as a "Sentinel Case Summary document for the investigation." *Id.* at 7. Plaintiff relies on a notation on that document stating that case information is "Restricted to everyone except Case Participants." *Id.*

8. Plaintiff alleges that it received the document, Plaintiff's Exhibit 4, from a whistleblower.[2] The document appears to be a screenshot from Sentinel containing administrative information, including a list of case participants, pertaining to an investigative case file.[3] Even if, for the sake of argument, that Defendant can assume the document is a screenshot from a Sentinel case file, it does not provide the information that Plaintiff contends. Case participant lists generally contain the names of numerous FBI employees and task force members involved *at one time* with administrative *or* investigative roles in an investigation. Thus, the presence of a person's name on a case participant list is not an indication that the individual is currently involved in the investigation nor that the individual even has or had an active, investigative role in the investigation (versus an administrative role).

---

[2] The whistleblower named by Plaintiff was not involved in the Project Veritas investigation to which the requested communications pertain.

[3] If the investigative case file is the same as the case file referenced in this declaration, then, as stated, the FBI reviewed the case file, and it does *not* contain responsive records.

4

9.      Regardless of the status of the individuals on the case participant list, the FBI did not provide Plaintiff with the "case summary document." The FBI has not officially disclosed a case participant list or any of the other types of information on the document and will not confirm nor deny that the document is in fact from Sentinel or from an investigative case file.[4]

10.     To the extent that Plaintiff asserts that the FBI should search outside of the CRS[5] and, specifically, search the email accounts of the 17 alleged FBI employees on the case participant list, Plaintiff has not provided any indication that such individuals' email accounts would be likely to contain the requested communications. Moreover, the FBI's media policy lists the individuals that are permitted to have contact with the media and those individuals are the FBI Director, Deputy Director, Associate Deputy Director, Assistant Director of the Office of Public Affairs (OPA), and the head of each field office, e.g., the Assistant Director in Charge (ADIC) of the New York Field Office, as well as the field office media coordinator. *See Public Affairs Policy Guide: Media Relations, External Communications, and Personal Use of Social Media*, 1002PG (dated November 14, 2017), p. 15 (Section 4.1.1).[6] If contact with the media concerns a sensitive issue, such as a sensitive investigative matter, then the ADIC or field office media coordinator must coordinate with OPA at FBIHQ. *Id.* Thus, the FBI has already searched the email accounts of the individuals authorized to communicate with the media (which would

---

[4] The FBI does not know the date of Plaintiff's Exhibit 4 nor whether it has been manipulated. Therefore, the FBI does not know whether it is an accurate reflection of the information in Sentinel at the time it was allegedly obtained. Regardless, given the unverified source of the document, the FBI will not acknowledge its validity.

[5] *See* Seidel Decl., ¶¶ 14-16, for a detailed explanation of the CRS.

[6] Available at https://vault.fbi.gov/public-affairs-policy-guide-media-relations-external-communications-and-personal-use-of-social-media-1002pg/public-affairs-policy-guide-media-relations-external-communications-and-personal-use-of-social-media-1002pg-part-01-of-01/view (last accessed May 24, 2023).

5

include contact with employees, contractors, or representatives of *The New York Times*). Again, that search did not result in the identification of any records responsive to the FOIA request. *See* Seidel Decl. ¶ 26.[7]

11.  In addition to the FBI's media policy requirements restricting contact with the media to specific individuals in the senior executive service (SES), when an email account search appears to be the best method of locating records responsive to a particular FOIA request, the FBI generally limits its searches to the email accounts of SES-level employees. This practice is because SES positions are generally public-facing, managerial or supervisory positions and thus SES-level employees have a reduced privacy interest.[8] Moreover, acknowledging employment of non-SES individuals or releasing the names of such individuals in connection with specific investigations exposes them to harassment[9] or worse. *See, e.g.,*

---

[7] *See* Seidel Declaration, ¶¶ 24-27, for a description of the nature of the FBI's email records, the email accounts searched, and the search terms used to search those email accounts. In addition, after receipt of Plaintiff's Opposition, the FBI conducted a subsequent search of these email accounts using the term "Veritas," which also did not result in the identification of responsive records.

[8] An SES-level position often requires the employee to, for example: engage in activities related to directing the work of an organizational unit; monitor progress toward organizational goals and periodically evaluate and make appropriate adjustments to such goals; supervise the work of employees; and decide on agency-wide or division-wide policy.

[9] Assignments of special agents to particular investigations are not by choice. Publicity, adverse or otherwise, arising from an investigation, may seriously prejudice an agent's or other FBI employee's effectiveness in conducting investigations or performing other day-to-day work. FBI employees in non-public facing positions should not be subject to unofficial questioning as to the conduct of any investigation or investigative activity. The FBI investigates violations of federal criminal law and activities pertaining to the national security. Publicity associated with the release of an agent's identity, for example, in connection with a particular investigation could trigger hostility toward that particular agent. During an investigation, an agent may engage with all strata of society, conducting searches and making arrests, both of which result in reasonable, but, nonetheless, serious disturbances to people and their lives. Persons targeted by an FBI investigation, and those sympathetic to those targeted, could seek to inflict violence on an FBI

https://www.cnn.com/2022/12/16/politics/edward-kelley-january-6-fbi-agents/index.html (describing charges against two individuals involved in the riots at the U.S. Capitol on January 6, 2021, including retaliating against a federal official, interstate threats, and solicitation to commit a crime of violence, based on a list of names of 37 law enforcement members to assassinate, noting which officers were involved in a defendant's arrest, on the January 6-related charges, or present during the search of his home). Clearly, harassment of FBI and other law enforcement personnel is not hypothetical. This tangible risk to such personnel weighs heavily in favor of withholding these individuals' identities and not acknowledging that they are employed by the FBI.

THE FBI USED ADEQUATE SEARCH TERMS TO MEET ITS OBLIGATION UNDER THE FOIA

12.     The FOIA request at issue in this litigation does not seek records regarding or referring to Ashley Biden's diary nor does it imply that Plaintiff seeks records related to or regarding the investigation into the apparent theft of Ashley Biden's diary. The FOIA request at issue seeks "communications sent to and from FBI officials" and *The New York Times* regarding the November 6, 2021, and November 4, 2021, execution of search warrants on the residences of Project Veritas founder James O'Keefe and journalist Spencer Meads, respectively. The FOIA request contains no information that would lead to a search outside of its specific parameters.

13.     With regard to the searches of the CRS, as stated in the Seidel Declaration, the FBI conducted a CRS indices search for "James O'Keefe" upon receipt of his certification of

---

employee based on his or her participation in the investigation. This is because an individual targeted by law enforcement may carry a grudge against those involved with the investigation, which may last for years, prompting them to seek revenge. There is no public interest served by disclosing the employees' identities or even acknowledging employment status, because generally their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities.

identity, as well as an indices search for "Project Veritas" and "Veritas"[10] to locate files containing records responsive to Plaintiff's request and subject to the FOIA.[11] These searches located only the pending file. *See* Seidel Decl. ¶ 22. The CRS indices search encompassed a search of the records of FBIHQ and field offices, including the New York Field Office. *Id.* at ¶ 14.

14. With regard to the searches of specific FBI employees' email accounts, the FBI searched the emails accounts of the individuals delineated by Plaintiff in the FOIA request using the terms "Spencer Meads," "Meads," "James O'Keefe," "O'Keefe," "OKeefe," "Project Veritas," and "Veritas." *See* Seidel Decl., ¶ 26, n. 11; *see also infra*, ¶ 10, n. 7. The FBI conducted a reasonable search using the search terms most likely to locate responsive records.

FAILURE TO SEARCH TEXT MESSAGES AND INSTANT CHAT MESSAGES

15. Consistent with its obligations to conduct reasonable searches, the FBI searched the places reasonably likely to contain records responsive to Plaintiff's request. The FBI did not separately search for text messages and instant chat messages. To the extent that text messages or instant chat messages are created in the context of conducting official agency business, they are considered to be records, and the FBI's records management policy mandates that FBI personnel enter all federal records into an authorized FBI recordkeeping system, such as the CRS. *See* the FBI's Record Management Policy Guide, 0769PG, pp. 7-8 (Section 2.8), p. 14

---

[10] After receipt of Plaintiff's Opposition, the FBI conducted a subsequent indices search of the CRS using the term "Veritas." The FBI did not search the CRS or email accounts using the term "James" or the term "Times," which would have likely resulted in a large number of non-responsive files or emails, respectively.

[11] As stated in the Seidel Declaration, ¶ 22, the FBI did not conduct a CRS indices search for Spencer Meads as Plaintiff did not submit a certification of identity on his behalf.

(section 4.8.3); *see also Records and Information Management Policy Guide*, 1223PG, at pp. 11-12 (Section 2.9), p. 19 (Sections 4.2.2.1 and 4.2.2.2).[12]

16. Federal law requires agencies to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities." 44 U.S.C. § 3101. In accordance with this mandate, the FBI established policies and procedures governing records management and requires that its personnel, for example:

- Create and maintain adequate, complete, accurate, and proper documentation of FBI programs, investigations, activities, decisions, and transactions.

- Ensure the records that personnel create and/or maintain are filed appropriately in an approved central recordkeeping system, such as Sentinel, and are properly indexed when appropriate.

- Ensure all records made or received while in the FBI's service have been properly recorded or properly and legally disposed of prior to separation from FBI service, in accordance with approved retention schedules.

- Cooperate with FBI Headquarters, field office, and legal attaché liaisons in the creation, maintenance, and disposition of FBI records.

- Ensure all deletion, destruction, and removal of FBI records complies with policies and

---

[12] There are two policy guides publicly available in the FBI's FOIA Vault on www.fbi.gov. *See* https://vault.fbi.gov/records-management-policy-guide-0769pg-part-01-of-01/Records%20Management%20Policy%20Guide%200769PG%20Part%2001%20of%2001/view (last accessed May 24, 2023), and https://vault.fbi.gov/records-and-information-management-policy-guide-1223pg/records-and-information-management-policy-guide-1223pg/view (last accessed May 24, 2023). The former is dated June 4, 2015. It has been superseded by the latter, dated September 22, 2022.

procedures established by the FBI's Information Management Division. *Records Management Policy Guide*, 0769PG, at pp. 7-8 (Section 2.8); *see also Records and Information Management Policy Guide*, 1223PG, at pp. 11-12 (Section 2.9).

17. FBI personnel are responsible for managing electronic communications that they send and receive, including substantive emails, text messages, and instant chat messages. FBI personnel must determine the record status for each electronic communication and import "nontransitory" communications, which may qualify as records, into an electronic recordkeeping system.[13] *Records Management Policy Guide*, 0769PG at p. 22 (Sections 4.8.14 - 4.8.15), p. 24 (Section 4.8.17); *see also Records and Information Management Policy Guide*, 1223PG, at pp. 25-28 (Sections 4.2.3.1 - 4.2.3.2).

18. In sum, indices searches of the CRS would include a search for electronic communications, such as text messages and instant chat messages, that have been serialized in the applicable investigative file. The FBI did not locate such communications. Moreover, Plaintiff has provided no reasonable basis to conclude that responsive text messages or instant chat messages existed at the time of the search cut-off date applicable to the request.

CONCLUSION

19. The FBI conducted an adequate and reasonable search for records responsive to Plaintiff's FOIA request; however, no records were located. In addition, the FBI found no information indicating responsive records would likely reside in a location other than those searched. Thus, the FBI has complied with its obligations under the FOIA.

---

[13] A "nontransitory" record is "a record needed for more than 180 days that ... provides substantive documentation of the FBI's policies and actions, ... contains important and/or valuable evidentiary information, and/or ... is required to be maintained by law or regulation." *Records Management Policy Guide*, 0769PG, at p. 11 (Section 4.3); *see also Records and Information Management Policy Guide*, 1223PG, at p. 14 (Section 4.1.1.1).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31st day of May, 2023.

Joseph E. Bender, Jr.
Acting Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia