## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JUDICIAL WATCH, INC.,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br><br>Defendant. | Civil Action No. 22-1034 (BAH)<br><br>Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

Plaintiff Judicial Watch, Inc., a nonprofit organization that "seeks to promote transparency, integrity, and accountability in government and fidelity to the rule of law" and "regularly requests records from federal agencies," Compl. ¶ 3, ECF No. 1, challenges the response of the Federal Bureau of Investigation ("FBI"), a component of defendant U.S. Department of Justice ("DOJ"), to a request submitted pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for records of communications between FBI officials and the *New York Times* ("*NYT*") regarding the FBI's execution of search warrants on November 4 and 6, 2021, at the homes of an employee and of the founder of Project Veritas, *id.* ¶ 5, which is described as "a non-profit non-governmental organization headquartered in Mamaroneck, New York," *id.*[1]  After the FBI had searched its records system and informed plaintiff of the existence of an active—and claimed exempt—investigative file pertaining to Project Veritas, plaintiff brought the instant lawsuit, alleging in a one-count complaint that the FBI failed to conduct an adequate search for responsive

---

[1]    Project Veritas "is a § 501(c)(3) organization that conducts investigations into a wide range of matters it considers to be of public interest," *Democracy Partners v. Project Veritas Action Fund*, 453 F. Supp. 3d 261, 268 (D.D.C. 2020), using "investigative methods [that] have spawned multiple civil lawsuits and a criminal judgment against [its founder]," *id.* at 269 n.4 (citing cases and criminal judgment).

records.  Compl. ¶¶ 16–19; Def.'s Mot. Summ. J. ("Def.'s Mot."), Att. 1, Decl. of Michael G. Seidel ("Seidel Decl."), Ex. C at 1, December 15, 2021 Letter, ECF No. 16-1.

Pending before the Court are the parties' cross-motions for summary judgment.  *See* Def.'s Mot., ECF No. 16; Pl.'s Opp'n Def.'s Mot. Summ. J. & Mem. Supp. Cross-Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 17.[2]  For the reasons set forth below, defendant's Motion for Summary Judgment is granted and plaintiff's Cross-Motion for Summary Judgment is denied.

## I.    BACKGROUND

The background underlying plaintiff's FOIA request is described below, followed by a review of plaintiff's FOIA request and the FBI's responses to the request both before and after the initiation of this lawsuit.

### A.    The FOIA Request

The search warrants about which plaintiff's FOIA request sought records were executed in connection with a criminal investigation into the theft of a diary belonging to the President's daughter, Ashley Biden.  Pl.'s Resp. SMF ¶¶ 25–27, ECF No. 17-1; Def.'s Resp. Pl.'s SMF ¶¶ 25–27, ECF No. 20-2.  On November 5 and 6, 2021, the *NYT* published two articles about the search warrants executed on November 4 and 6 at the homes of Project Veritas's employee Spencer Meads and founder James O'Keefe, "citing 'people briefed' on the matter as its sources."  Pl.'s Resp. SMF ¶¶ 29–31 (citing Michael Schmidt et al., *People Tied to Project Veritas Scrutinized in Theft of Diary from Biden's Daughter*, N.Y. TIMES (Nov. 5, 2021, updated Nov. 12, 2021), https://www.nytimes.com/2021/11/05/us/politics/project-veritas-investigation-ashley-biden-

---

[2]    Certain memoranda and accompanying attachments filed in support of the cross-motions are docketed twice and, to simplify citation, only one of the duplicate submissions is cited.  For example, Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment is docketed at both ECF Nos. 17 and 18, but only the former is cited.  Defendant's Reply in Support of its Motion for Summary Judgment and Memorandum in Opposition to Plaintiff's Cross-Motion for Summary Judgment is docketed at both ECF Nos. 20 and 21, and only the former is cited.

diary.html; Michael S. Schmidt, et al., *F.B.I. Searches James O'Keefe's Home in Ashley Biden Diary Theft Inquiry*, N.Y. Times (Nov. 6, 2021, updated Nov. 12, 2021) ("*NYT* Article, Nov. 6, 2021"), https://www.nytimes.com/2021/11/06/us/politics/james-okeefe-project-veritas-ashley-biden.html).  Each article was updated days following publication.

On November 10, 2021—even before the final updates to the *NYT* articles were made on November 12—plaintiff submitted to the FBI the FOIA request at issue, seeking records, from October 1, 2021, to "present," of communications between FBI officials and the *NYT* regarding what plaintiff described as "the FBI search warrants and raid" on the homes of O'Keefe and Meads. Compl. ¶ 5.  The FOIA request detailed that the requested "communications" included "email (on .gov or non.gov email accounts), text message, or instant chat," with FBI officials, including "in the offices of the FBI Director, FBI Deputy Director, Office of General Counsel, Office of Public Affairs, and/or the FBI New York Field Office" ("NYFO").  *Id.*; *see also* Seidel Decl., Ex. A, FOIA Request, ECF No. 16-1.

Following receipt of plaintiff's FOIA request, the FBI searched its Central Records System ("CRS") for main index entries via Sentinel, the FBI's case management system.  Seidel Decl. ¶¶ 17–19.  CRS contains "applicant, investigative, intelligence, personnel, administrative, and general files," "spans the entire FBI organization[,] and encompasses the records of FBI Headquarters (HQ), FBI field offices, and FBI legal attaché offices (legats) worldwide."  *Id.* ¶ 14.  Information in CRS that is "deemed of sufficient significance to warrant indexing for future retrieval" is manually indexed by FBI personnel but not "every individual name or other subject matter" is indexed.  Seidel Decl. ¶ 16.  A main index entry is created for each "subject or focus of an investigation" and a reference index is created for individuals or non-individuals "associated with an investigation, but who or which is not the main subject or focus of the investigation."  *Id.*

3

The FBI searched on CRS for the term "Project Veritas" and applied a cut-off date of November 24, 2021, the date of the FBI's initial search.  *Id.* ¶ 19.  The FBI did not search for records relating to the Project Veritas employee or founder by name, because plaintiff had not supplied a privacy waiver or proof of death for either.  *Id.* ¶ 19 n.6; Def.'s Reply Supp. Mot. Summ. J. & Opp'n Pl.'s Cross-Mot. Summ. J. ("Def.'s Opp'n"), Att. 1, Decl. of Joseph E. Bender, Jr. ("Bender Decl.") ¶ 5, ECF No. 20-1.  This search identified one responsive file that the FBI determined contained "law enforcement records" related to "a pending or prospective law enforcement proceeding."  Seidel Decl. ¶ 8; Seidel Decl., Ex. C at 1, December 15, 2021 Letter.  By letters, dated December 15, 2021, and January 6, 2022, the FBI advised that release of the material located in the active investigative file "could reasonably be expected to interfere with enforcement proceedings," and that such record was accordingly "exempt from disclosure pursuant to [FOIA exemption (b)(7)(A)]." Seidel Decl., Ex. C at 1, December 15, 2021 Letter; Seidel Decl. ¶ 8; Bender Decl. ¶ 5; Answer ¶ 11, ECF No. 9.

Plaintiff appealed the FBI's denial of the FOIA request to DOJ's Office of Information Policy ("OIP"), which, on February 14, 2022, denied this administrative appeal and affirmed the FBI's determination that the requested records were properly withheld pursuant to exemption (b)(7)(A).  Seidel Decl. ¶ 11; Seidel Decl., Ex. F, February 14, 2022 Letter, ECF No. 16-1.

B.    **Procedural History**

On April 13, 2022, plaintiff filed the instant lawsuit seeking relief under the FOIA.  *See generally* Compl.  Following this filing, the FBI determined that plaintiff's FOIA request had been misinterpreted as seeking records "pertaining to Project Veritas, James O'Keefe, and Spencer Meads," as opposed to records "of *communications* between FBI officials and employees, contractors, and representatives of *The New York Times* regarding" the search warrants executed

at the homes of O'Keefe and Meads.  Bender Decl. ¶ 6 & n.1; Pl.'s Reply Supp. Cross Mot. Summ.

J. ("Pl.'s Reply") at 1 n.1, ECF No. 22.  Thereafter, the FBI conducted a "page-by-page" review

of the active investigative file for any records of the requested communications, searching for the

terms "New York Times," "NY Times," and "Times," and, upon receipt of O'Keefe's certification

of identity in February 2023, "James O'Keefe" and "O'Keefe," which also returned results for

"James OKeefe."  Seidel Decl. ¶¶ 21–22 & nn.7–8.  The FBI also conducted an additional search

of CRS for the term "James O'Keefe."[3]  *Id.* ¶ 22.  The FBI "contacted Plaintiff to explain" that

CRS contained no responsive records, but that the FBI would additionally "search the classified

and unclassified email accounts of certain individuals in the offices delineated by Plaintiff."  Seidel

Decl. ¶ 26.

The FBI accordingly searched the classified and unclassified email accounts of certain

individuals within the FBI offices identified in plaintiff's request for records exchanged between

October 1, 2021, and November 24, 2021 (the same time period applied to its search of the CRS),

using the search terms "Spencer Meads," "Meads," "James O'Keefe," "O'Keefe," "OKeefe,"

"Project Veritas," and "Veritas."  Bender Decl. ¶ 14; Seidel Decl. ¶ 26.  The FBI limited its search

to individuals who, during that time period, "held a position at the Senior Executive Service (SES)

level, had been officially acknowledged by the FBI as an FBI employee in the context of the

records at issue, or held a public-facing position."  Seidel Decl. ¶ 26.  The FBI located no

responsive records from these email searches.  *Id.* ¶ 27.  Based on the results of its email searches

and review of the investigative file pertaining to Project Veritas, the FBI concluded that "a search

elsewhere would not reasonably be likely to locate responsive records."  *Id.* ¶ 28.

---

[3]    Following the filing of plaintiff's opposition brief, the FBI conducted a subsequent search of CRS and
email accounts for the term "Veritas."  Bender Decl. ¶¶ 10 n.7, 13 n.10.

## II.    LEGAL STANDARD

"[A]n agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents," *Watkins L. & Advoc., PLLC v. U.S. Dep't of Just.*, 78 F.4th 436, 442 (D.C. Cir. 2023) (quoting *Valencia–Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999)), and "perform[s] more than a perfunctory search" to identify responsive records, *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011); *see also In re Clinton*, 973 F.3d 106, 116 (D.C. Cir. 2020).

When an agency's search for records is challenged, "a district court is not tasked with uncovering whether there might exist any other documents possibly responsive to the request, but instead, asks only whether the search for [the requested] documents was adequate."  *In re Clinton*, 973 F.3d at 116 (internal quotation marks and emphasis omitted) (quoting *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984)).  In this regard, "[a]n agency need not search every record system or demonstrate that all responsive documents were found and that no other relevant documents could possibly exist," *Watkins L. & Advoc., PLLC*, 78 F.4th at 442 (internal quotation marks omitted) (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)),  although the agency "may not limit its search to only one record system if there are others that are likely to turn up the information requested," *Montgomery v. Internal Revenue Serv.*, 40 F.4th 702, 714 (D.C. Cir. 2022) (internal quotation marks omitted) (quoting *Oglesby*, 920 F.2d at 68).

At the summary judgment stage, an agency meets its burden of demonstrating beyond material doubt that it "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested," *Watkins L. & Advoc., PLLC*, 78 F.4th at 442 (quoting *Oglesby*, 920 F.2d at 68), by submitting to the court a

6

"reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched," *Shapiro v. U.S. Dep't of Just.*, 40 F.4th 609, 612–13 (D.C. Cir.), *cert. denied*, 143 S. Ct. 526 (2022) (quoting *Reps. Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017)). "Summary judgment is inappropriate if a review of the record raises substantial doubt as to the search's adequacy, particularly in view of well defined requests and positive indications of overlooked materials." *Shapiro*, 40 F.4th at 613 (quoting *Reps. Comm. for Freedom of Press*, 877 F.3d at 402).

## III.   DISCUSSION

Plaintiff makes a three-pronged challenge to the adequacy of the FBI's search, which did not uncover responsive records of communications between the *NYT* and the FBI regarding the FBI search warrants, executed in November 2021 at the homes of two Project Veritas personnel, and urges that additional searches be conducted at more locations, using more search terms, and certain types of communications data sources.   Specifically, plaintiff argues the search was inadequate for failing (1) to cover the FBI New York Field Office and email accounts of FBI agents working on the search warrants, (2) to use every search term plaintiff requested, and (3) to review individual FBI agents' text messages and instant chat messages.   Acknowledging that the search did not uncover responsive records, DOJ defends the FBI's search as reasonable, as supported by two detailed declarations, totaling 48 pages, describing the searches conducted.   Def.'s Opp'n at 1, ECF No. 20; *see generally* Seidel Decl.; Bender Decl.   None of plaintiff's challenges to the search has sufficient merit to defeat DOJ's motion for summary judgment.

### A.      Plaintiff's Belief About Existence of Requested Records is Speculative

Plaintiff's claim that the FBI did not "conduct[] a search 'reasonably calculated to uncover'" responsive communications about the search warrants referenced in its FOIA request, Pl.'s Opp'n at 8 (quoting *Oglesby*, 920 F.2d at 68), rests on plaintiff's apparent belief that the FBI was the source for information relayed by the *NYT* in its reporting regarding the execution of the search warrants.  No matter how fervently held, however, plaintiff's belief does not drive the legal assessment of the adequacy of a search for records under the FOIA.  A brief review of the record— including, notably, information plaintiff supplies—demonstrates that plaintiff's belief is without reasonable foundation or, put more bluntly, is pure speculation.

Plaintiff insists that the requested records must exist based on the premise that "information communicated to and published by" the *NYT* regarding the search warrants' execution "was restricted to everyone except" those involved in the FBI's investigation of the diary theft.  Pl.'s Opp'n at 7.  This premise is plainly incorrect.  Plaintiff's speculation that the FBI was the source for the *NYT*'s reporting fails to acknowledge the reality, that there was nothing surreptitious about execution of the search warrants.  To the contrary, the warrants were necessarily executed in broad daylight and thus plainly observable to the public.  *See* Pl.'s Opp'n, Decl. of Kathryn Blankenberg ("Blankenberg Decl."), Ex 1, Search Warrant for Spencer Meads's Residence at 1, ECF No. 17-4 (directing execution of warrant "in the daytime"); Blankenberg Decl., Ex. 2, Search Warrant for James O'Keefe's Residence at 1, ECF No. 17-5 (same).  Indeed, plaintiff's own exhibit of redacted emails, produced by the Executive Office of U.S. Attorneys ("EOUSA") in another FOIA lawsuit brought by plaintiff, references that the *NYT* had contact with a neighbor of O'Keefe regarding the execution of the search.  *See* Blankenberg Decl., Ex. 3, Emails at 5, ECF No. 17-6 ("The Times

has his neighbor on record . . . saying that FBI were banging on O'Keefe's door[.]").[4]   Moreover, as articles cited by plaintiff make clear, O'Keefe himself spoke directly to the *NYT* regarding the FBI investigation, including even before the search warrant was executed at his residence.  *See NYT* Article, Nov. 6, 2021 ("Federal authorities on Saturday searched the home of James O'Keefe . . . *a day after* Mr. O'Keefe acknowledged that the group was under investigation by the Justice Department." (emphasis supplied)); Adam Goldman & Mark Mazzetti, *Project Veritas and the Line Between Journalism and Political Spying*, N.Y. Times (Nov. 11, 2021, updated Nov. 12, 2021) ("*NYT* Article, Nov. 11, 2021"), https://www.nytimes.com/2021/11/11/us/politics/project-veritas-journalism-political-spying.html (cited in Pl.'s Resp. SMF ¶ 32) ("Mr. O'Keefe has acknowledged receiving a grand jury subpoena in the case.").

Plaintiff further claims in its Statements of Fact that the emails show that "communications between [officials in the U.S. Attorney's Office for the Southern District of New York ("SDNY-USAO")] and the [*NYT*] about the warrants and the FBI investigation began on the morning on November 4, at the time of or shortly [after] the execution of the search warrants at the residences of Spencer Meads and another Project Veritas" employee.  Pl.'s Resp. SMF ¶ 39; Blankenberg Decl., Ex. 3, Emails.  These redacted emails indicate that these communications were initiated by the *NYT* and reflect efforts by the *NYT* to do its job and obtain information from the SDNY-USAO around the time the Meads search warrant was executed.  They offer no evidence that correspondence likewise occurred between the FBI and the *NYT*, let alone confirmation that "information . . . published by [the *NYT*] is the type of information that was restricted to everyone

---

[4]        In that lawsuit, since dismissed by stipulation, plaintiff sought records of communications between the *NYT* and SDNY-USAO regarding, in relevant part, the search warrants at issue in the instant case.  Pl.'s Resp. SMF ¶ 38 (citing *Jud. Watch, Inc. v. U.S. Dep't of Just.*, No. 22-cv-2652 (RC) (D.D.C. 2022)); *see also* Stipulation of Dismissal, *Jud. Watch, Inc.*, No. 22-cv-2652 (RC) (D.D.C. filed Oct. 24, 2023).

except" those on the case participant list for the FBI's investigation of the Biden diary theft.  Pl.'s Opp'n at 7.

Plaintiff nevertheless seemingly insists, through representations in its Statements of Fact, that such messages must exist, due to inferences that could be drawn from the *NYT* reportedly publishing excerpts of Project Veritas legal memoranda "just hours after a court ordered the FBI to pause its extraction and review of O'Keefe's cellphones"; "O'Keefe's lawyers['] represent[ation]" in unrelated litigation "that the memoranda were located on the cellphone FBI seized from O'Keefe"; and the *NYT*'s representation, again in unrelated litigation, "that the memoranda were acquired by its journalists outside of any discovery process in its ongoing litigation against Project Veritas."  Pl.'s Resp. SMF ¶¶ 32–34 (citing *NYT* Article, Nov. 11, 2021); Petitioner's Motion for Miscellaneous Relief at 1–3, *In re Search Warrant dated November 5, 2021*, 21-mag-10685 (S.D.N.Y. Nov. 15, 2021); Brief for Appellant at 2–7, *Project Veritas v. N.Y. Times Co., et al.*, No. 2021-09551 (N.Y. App. Div. 2d Dept. March 11, 2022)).[5]  Plaintiff's apparent speculation that the FBI obtained Project Veritas legal memoranda from O'Keefe's cellphone and provided such memoranda to the *NYT* ignores the obvious and publicly cited source for information about the legal memoranda, namely, "O'Keefe's lawyers," who "represent[ed] that the memoranda were located on [O'Keefe's] cellphone."  Pl.'s Resp. SMF ¶ 34.

Plaintiff is seemingly convinced that records of communications about the search warrants between the *NYT* and the FBI must exist despite the sparsity of credible support for this inference. Guiding review of plaintiff's challenge to the search here, is the well-settled law "that an 'agency's failure to turn up a particular document, or mere speculation that as yet uncovered documents

---

[5]    The docket relating to the search warrant, dated November 5, 2021, No. 21-mag-10685, which plaintiff cites for the proposition regarding O'Keefe's lawyers' representation, remains sealed.  *See In re Search Warrant Dated Nov. 5, 2021*, No. 21-misc-813 (ATSLC), 2021 WL 5830728, at *1 n.1 (S.D.N.Y. Dec. 7, 2021).

might exist, does not undermine the determination that the agency conducted an adequate search for the requested records.'" *Watkins L. & Advoc., PLLC*, 78 F.4th at 446 (quoting *Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004)).

### B.    Locations Searched

Plaintiff asserts that the FBI failed to search or "contact the New York Field Office," which was "likely to possess potentially responsive records, about the requests," or to search the email accounts of "the limited number of FBI officials who would likely possess potentially responsive records." Pl.'s Opp'n at 1–2, 6–8; Pl.'s Reply at 1–2. This contention misconceives the standard for the adequacy of an agency's search under the FOIA.

At the outset, just because plaintiff pointedly asked the FBI to conduct a search of specific locations does not impose an obligation on the agency to do so. *See Watkins L. & Advoc., PLLC*, 78 F.4th at 441, 447–49 (rejecting FOIA requestor's argument that DOJ should have complied with direction to "please forward" request to conduct searches of additional components, stating "nothing in the statute (or in DOJ's regulations) enables a FOIA requester to impose that kind of obligation on an agency by asking for it"); *see also Mobley v. CIA*, 806 F.3d 568, 582 (D.C. Cir. 2015) (an approach that "would allow a requester to dictate, through search instructions, the scope of an agency's search," would "undermine[]" "the reasonableness test for search adequacy long adhered to in this [C]ircuit").

An agency's search obligations are dictated by whether the scope of the search is "reasonably calculated to uncover all relevant documents," *In re Clinton*, 973 F.3d at 116 (internal quotation marks and emphasis omitted) (quoting *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994)), a standard that an agency satisfies by searching "all files likely to contain responsive materials (if such records exist)," *Ancient Coin Collectors Guild*, 641 F.3d at 514

(quoting *Valencia–Lucena*, 180 F.3d at 326).  Although an agency may have an obligation to search a particular field office in the "'rare case . . . in which an agency record contains a lead so apparent'—i.e., 'a lead that is both clear and certain'—that the agency 'cannot in good faith fail to pursue it,'" *Watkins L. & Advoc., PLLC*, 78 F.4th at 449 (quoting *Kowalczyk v. U.S. Dep't of Just.*, 73 F.3d 386, 389 (D.C. Cir. 1996)), that is not the situation here.

In its initial and supplemental declarations, the FBI explained that "a search of [CRS]," which contains "records of FBI Headquarters, FBI field offices, and FBI legal attaché offices (legats) worldwide," "would encompass records from the FBI's New York Field Office and investigative records of applicable Supervisory Special Agents, and other individuals who have or had an active role in the investigation." Def.'s Opp'n at 5 (citing Seidel Decl. ¶¶ 14–18; Bender Decl. ¶¶ 13–14, 18–19).  Plaintiff does not contest the FBI's description of the scope of its record system as covering records in the New York Field Office.  Indeed, the search conducted using the FBI's selection of relevant search terms did locate an open investigative file regarding Project Veritas, *see* Bender Decl. ¶ 5; Seidel Decl. ¶ 19, seemingly proof that the FBI's system and search terms used were effective in this case.

Yet, unable to cite any "positive indication[] of overlooked materials," *Montgomery*, 40 F.4th at 715 (citation omitted), plaintiff seeks a broader search of the New York Field Office, arguing that this location is "likely to possess responsive records" of FBI communications with the *NYT* because the search warrants at issue in plaintiff's FOIA request were executed in New York, New York, and were signed by a New York Field Office agent, *see* Pl.'s Reply at 1–2 (capitalization omitted).  This speculation is itself based on the premise, as discussed *supra*, in Part III.A, that the communications plaintiff believes occurred did happen.  Such speculation is simply not a "clear and certain" lead "indicat[ing] that there were undiscovered responsive records in" the

FBI's New York Field Office." *Watkins L. & Advoc., PLLC* 78 F.4th at 449 (quoting *Kowalczyk*, 73 F.3d at 389, and citing *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 28–29 (D.C. Cir. 1998), *as amended* (Mar. 3, 1999)).

Agency declarations explaining search scope and methodology are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Shapiro*, 40 F.4th at 613 (internal quotation marks omitted) (quoting *Bartko v. U.S. Dep't of Just.*, 898 F.3d 51, 74 (D.C. Cir. 2018)).   As explained in the FBI's declarations, the FBI's search of the CRS captured records from the FBI's New York Field Office and from "individuals who have or had an active role in the investigation." Def.'s Opp'n at 5 (citing Seidel Decl. ¶¶ 14–18; Bender Decl. ¶¶ 13–14, 18–19).  Here, "there is no discernible evidence in the record that" any responsive materials in the FBI's New York Field Office exist, and plaintiff's "continued speculation" that they do is plainly insufficient to overcome the presumption of good faith accorded to the FBI's declarations. *Bartko*, 898 F.3d at 73–74; *see also Watkins L. & Advoc., PLLC*, 78 F.4th at 450 ("find[ing] no error in the district court's grant of the good faith presumption to the FBI and DOJ declarations" where declarations were "relatively detailed and non-conclusory" and plaintiff's "claims about the purported inadequacies of the agencies' searches raise no concerns about the declarants' (or the agencies') good faith" (quoting *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)); *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 584–86 (D.C. Cir. 2020) (affirming adequacy of search by Federal Bureau of Prisons where "[n]othing in the record refutes the Bureau's repeated assertions that it . . . has no records responsive to [plaintiff's] demands" and plaintiff "has provided us with no reason to doubt the veracity of the prison officials' response"); *Hodge v. FBI*, 703 F.3d 575,

580, 582 (D.C. Cir. 2013) (upholding agency response to FOIA request where requester "has not presented sufficient evidence to rebut [the] presumption" accorded to the agency's averments).

Plaintiff's additional challenge that the FBI failed to search the email accounts of "the limited number of FBI Case Participants who had prior knowledge" of the search warrants is similarly without foundation. Pl.'s Opp'n at 6. Plaintiff dismisses as insufficient the FBI's search of the email accounts of individuals who were in the senior executive service ("SES") and permitted, per the FBI's media policy, "to communicate with the media," including, among others, FBI Director Christopher Wray, Deputy Director Paul Abbate, General Counsel Jason Jones, Office of Public Affairs Assistant Director Cathy Milhoan, and New York Field Office Assistant Director in Charge Michael Driscoll." Seidel Decl. ¶ 26; Bender Decl. ¶ 10.[6] The FBI explained that because these individuals were "authorized to communicate with the media (which would include contact with employees, contractors, or representatives of [the *NYT*])," if such records existed, these were the accounts that could be "expected to have responsive records." Bender Decl. ¶¶ 10–11; Def.'s Opp'n at 6. In plaintiff's view, "it was unreasonable for Defendant to limit its search to SES officials" because "information communicated to and published by [the *NYT*] is the type of information that was restricted to everyone except" those on the case participant list for the FBI's investigation of the diary theft. Pl.'s Opp'n at 7. As explained, *supra*, in Part III.A, however, plaintiff's premise that the FBI was the source for the *NYT*'s reporting ignores the more obvious, cited sources for the reported information, including a neighbor at the location targeted in the

---

[6]     The FBI also searched the email accounts belonging to Eric Vélez-Villar, Office of Private Sector Assistant Director, and Bryan Vorndran, Cyber Division Assistant Director, who were identified in another FOIA request by plaintiff, since dismissed by stipulation, that sought records of communications between FBI and Pfizer Inc. regarding "O'Keefe and/or Project Veritas," as well as results from the email searches conducted for that FOIA request. Seidel Decl. ¶¶ 26–27; *see* Compl. ¶ 5, *Jud. Watch v. U.S. Dep't of Just.*, No. 22-cv-1035 (TSC), ECF No. 1 (filed D.D.C. Apr. 13, 2022).

warrant, the founder of Project Veritas and lawyers for Project Veritas, and even information potentially relayed in response to the *NYT*'s inquiries by the SDNY-USAO.

Plaintiff's request that additional searches are required of email accounts of individual FBI agents and personnel participating in some fashion with the search warrant investigation and execution, therefore boils down to speculation that these individuals likely have email accounts and likely use email and therefore could have used email to communicate with the *NYT*.  This reasoning about the possible use of email "without more[,] does not invariably constitute a 'lead' that an agency must pursue." *Mobley*, 806 F.3d at 582 (quoting *Kowalczyk*, 73 F.3d at 389); *see also Cause of Action v. Internal Revenue Serv.*, 253 F. Supp. 3d 149, 159–60 (D.D.C. 2017) (affirming adequacy of search against challenge that IRS failed to search email records despite an "unrelated Congressional investigation into the agency's handling of tax-exempt entities, and the fact that the investigation unearthed communications on that topic made via email," where "there [was] no actual evidence of wrongdoing in this case, and the obvious fact that employees of any government or private entity are likely to use email . . . is not enough to support plaintiff's call for a broad search into email").  Moreover, plaintiff makes no claim that the FBI "ignored indications in documents found in its initial search that there were additional responsive documents" located in the case participants' email accounts, but merely speculates that responsive documents are missing from the FBI's search.  *Montgomery*, 40 F.4th at 715; *see* Pl.'s Opp'n at 6–8; Pl.'s Reply at 1–2.  Plaintiff's demand for additional email account searches, after the FBI had already informed plaintiff of the existence of the active investigative file "associated with Project Veritas," *see* Bender Decl. ¶ 5—and thus given plaintiff more information than plaintiff's FOIA request had demanded—is accordingly "mere fiat," *Mobley*, 806 F.3d at 582, unsupported by any "positive indications of overlooked materials" to substantiate plaintiff's claim that additional email accounts

would reasonably contain responsive records, *Montgomery*, 40 F.4th at 715 (quoting *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)).

Set against the FBI's detailed declarations demonstrating that the FBI conducted a good-faith search, plaintiff has not carried its burden of "establish[ing] a sufficient predicate to justify" the FBI searching additional email accounts.  *Campbell*, 164 F.3d at 28 (citation omitted); *see also Nolen v. U.S. Dep't of Just.*, 146 F. Supp. 3d 89, 97 (D.D.C. 2015) ("Once an agency has conducted a good faith search in response to a FOIA request, the burden is on the requesting party to provide evidence that other databases are reasonably likely to contain responsive documents." (citing *Campbell*, 164 F.3d at 28)).  Simply put, plaintiff has failed to raise "substantial doubt as to the [] adequacy" of the FBI's email account searches.  *Shapiro*, 40 F.4th at 613 (quoting *Reps. Comm. for Freedom of Press*, 877 F.3d at 402); *see also Mobley*, 806 F.3d at 581–83 (rejecting plaintiff's claim that FBI "was required to search . . . the record systems he asked it to search," where plaintiff offered no "supporting evidence" justifying its request and the FBI explained that "record systems [plaintiff] asked the FBI to search either [we]re captured by the CRS or [] unlikely to contain responsive records").

## C.    Search Terms

Next, plaintiff challenges as inadequate the search terms employed by the FBI.  The FBI searched CRS indices for "Project Veritas," "Veritas," and "James O'Keefe"; the investigative case file for "New York Times," "NY Times," "Times," "James O'Keefe," and "O'Keefe"; and email accounts for "Spencer Meads," "Meads," "James O'Keefe," "O'Keefe," "OKeefe," "Project Veritas," and "Veritas."  Bender Decl. ¶¶ 13 & n.10, 14; Seidel Decl. ¶¶ 19, 21 & n.7.  The searches "located only the pending [investigative] file."  Bender Decl. ¶ 13.  Plaintiff posits that the terms used were inadequate for two reasons, arguing that the FBI should have used "logical variations"

of the FBI's search terms, such as "Times" and "PV,"  Pl.'s Opp'n at 9; Pl.'s Reply at 3; and that

the FBI should have used terms "that would encompass communications with the [*NYT*]

'regarding' the search warrants," suggesting the FOIA request required a search for records

regarding the broader investigation into the theft of Ashley Biden's diary, Pl.'s Opp'n at 2, 8–11;

*see also* Pl.'s Reply at 2–5.

   To be sure, as plaintiff contends, an "agency is obligated to construe a FOIA request

liberally."  Pl.'s Opp'n at 8 (citing *Nation Mag., Wash. Bur. v. U.S. Customs Serv.*, 71 F.3d 885,

890 (D.C. Cir. 1995)).  This legal duty on the part of an agency is cabined, however, by two other

pertinent legal principles applicable to FOIA cases: first, that "[t]he adequacy of a FOIA search .

. . is generally determined not by the fruits of the search, but the appropriateness of the methods

used to carry out the search,"  *Watkins L. & Advoc., PLLC*, 78 F.4th at 444 (internal quotation

marks omitted) (quoting *Ancient Coin Collectors Guild*, 641 F.3d at 514); and second, that an

agency processing a FOIA request is not "required to divine a requester's intent" nor "expand [its]

searches beyond the four corners of the request,"  *Elgabrowny v. CIA*, 613 F. Supp. 3d 170, 184

(D.D.C. 2020) (internal quotation marks and citations omitted); *see also Kowalczyk*, 73 F.3d at

389 ("The agency is not required to speculate about potential leads . . . [or] to look beyond the four

corners of the request for leads to the location of responsive documents.").  These two latter

guideposts in assessing the adequacy of the search at issue demonstrate that plaintiff's challenge

fails.

   Here, the FBI "crafted searches reasonably tailored to locate responsive documents."

*Watkins L. & Advoc., PLLC*, 78 F.4th at 444.  In its initial and supplemental declarations, the FBI

explained its "determin[ation] that [its] search terms would allow the FBI to locate any potentially

responsive communications in the email accounts" and that it "us[ed] the search terms most likely

to locate responsive records."  Seidel Decl. ¶ 26; Bender Decl. ¶ 14.  Moreover, as plaintiff does

not dispute, plaintiff had "not requested the FBI employ any other search terms besides 'Meads,'

'O'Keefe,' and 'Okeefe' in either its FOIA request or subsequent negotiations regarding the FBI's

searches for responsive records."  Def.'s Opp'n at 12 (citation omitted).  When conducting the

searches, the FBI used these search terms suggested by plaintiff, *see id.*; Bender Decl. ¶ 14,  as

well as additional search terms that the FBI determined would be "most likely to locate responsive

records," *see* Bender Decl. ¶ 14; Seidel Decl. ¶¶ 25–27.  Given the focus of plaintiff's FOIA request

for communications between the FBI and the *NYT* "regarding the FBI search warrants" executed

at the homes of Meads and O'Keefe, Compl. ¶ 5, the FBI's search used specific terms (*e.g.*, "New

York Times," "Project Veritas," Seidel Decl. ¶ 21 n.7; Bender Decl. ¶ 13), that were reasonably

calculated to lead to responsive documents.

      The fact that the FBI did not use the specific search terms plaintiff now suggests during

litigation to search CRS indices, the investigative file, and email accounts does not, plaintiff's

speculation notwithstanding, *see* Pl.'s Opp'n at 8–11; Pl.'s Reply at 2–5, undermine the conclusion

that the search was reasonable.  *See Heffernan v. Azar*, 317 F. Supp. 3d 94, 107–08 (D.D.C. 2018)

("find[ing] the search terms that were employed were reasonable" where agency used more than

ten "reasonably tailored search terms" and "there is no indication that the plaintiff requested the

defendant to employ th[e] proposed search terms either in his FOIA request or subsequent

negotiations regarding the defendant's searches for responsive documents").

      Moreover, although plaintiff asserts—in an argument subsequently abandoned on reply—

that the FBI improperly "used [terms] to search email records [that] differ[ed] from the terms used

to search the CRS," Pl.'s Opp'n at 11, the FBI's use of "different search terms for different

databases . . . does not undermine the conclusion that the search was reasonable," *Liberation*

*Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137, 146 (D.D.C. 2015) (citations omitted); *see also Jud. Watch, Inc. v. U.S. Dep't of Hous. & Urban Dev.,* 20 F. Supp. 3d 247, 254 (D.D.C. 2014) ("Though some agencies may choose to search for responsive documents in a centralized fashion using consistent search terms and techniques across various departments, nothing in FOIA's text or the relevant case law requires an agency to do so."); *Jud. Watch, Inc. v. U.S. Dep't of State*, No. 12-cv-893 (JDB), 2017 WL 3913212, at *9 (D.D.C. Sept. 6, 2017) ("[T]he fact that different offices used different search terms [does not] undermine the reasonableness of the State Department's search." (citations omitted)).

The FBI has discretion in crafting a list of search terms that it "believe[s] to be reasonably tailored to uncover documents responsive to the FOIA request." *Heffernan v. Azar*, 417 F. Supp. 3d 1, 11 (D.D.C. 2019) (citation omitted); *see also Agility Pub. Warehousing Co. K.S.C. v. Nat'l Sec. Agency*, 113 F. Supp. 3d 313, 339–40 (D.D.C. 2015) ("Although the NSA could have used additional variations of the plaintiff's name or the legal case numbers, the NSA's search terms were reasonably calculated to lead to responsive documents," where "'[t]here is no bright-line rule requiring agencies to use the search terms proposed' by a plaintiff." (quoting *Physicians for Hum. Rts. v. U.S. Dep't of Def.*, 675 F. Supp. 2d 149, 164 (D.D.C. 2009))).  Where the search terms are reasonably calculated to lead to responsive documents, the Court should not "micro manage" the agency's search.  *Johnson v. Executive Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) ("FOIA, requiring as it does both systemic and case-specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the courts should attempt to micro manage the executive branch.").[7]

---

[7] Plaintiff relies on several cases, in which the agencies' searches were held inadequate, to argue "[t]he minimal search terms used demonstrates that Defendant did not conduct a search 'reasonably calculated to uncover all relevant documents.'"  Pl.'s Opp'n at 8–10 (quoting *Oglesby*, 920 F.2d at 68) (citing *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 373 F. Supp. 3d 120, 125 (D.D.C. 2019), *Pulliam v. EPA*, 235 F. Supp. 3d 179, 193 (D.D.C. 2017), and *Avila v. U.S.*

Moreover, although plaintiff asserts that "Defendant was reasonably aware that the communications Plaintiff [sought] refer to" the investigation of the Ashley Biden diary theft, Pl.'s Opp'n at 9, plaintiff's FOIA request "did not seek records regarding or referring to Ashley Biden's diary nor . . . imply that Plaintiff [sought] records related to or regarding the investigation[,]" Def.'s Opp'n at 11 (citing Seidel Decl. ¶ 6; Bender Decl. ¶ 12).  Instead, the FOIA request was expressly and far more narrowly targeted at communications between the *NYT* and FBI regarding the execution of two specific search warrants on two separate dates in November 2021.  Thus, the FBI reasonably construed the scope of plaintiff's request to encompass "'communications sent to and from FBI officials' and [the *NYT*] regarding the . . . execution of search warrants." Def.'s Opp'n at 9 (quoting Seidel Decl. ¶ 6).  That the FBI did not use terms that would encompass communications with the *NYT* "regarding" the broader investigation leading to the execution of search warrants, "does not render the agency's search unreasonable, especially because nothing in [plaintiff's] FOIA request indicated that those terms were essential." *Watkins L. & Advoc., PLLC*, 78 F.4th at 444–45.  Plaintiff's apparent "attempts to broaden the scope of its [r]equest . . . in this litigation. . .  cannot overcome the clear and cabined text of its [r]equest." *DaVita Inc. v. U.S.*

---

*Dep't of State*, No. 17-cv-2685 (RC), 2022 WL 2104483, at *4–7 (D.D.C. June 10, 2022)).  This reliance is misplaced, however, since these cases are easily distinguishable on their facts and actually confirm the adequacy of the FBI's search here.  In *Judicial Watch, Inc.*, the FBI "searched only for the terms 'assignment,' 'reassignment,' and 'appointment' in conjunction with the phrase 'special counsel,'" even though plaintiff's FOIA request "referred to Mueller by name" and "one would expect . . . FBI personnel might use the Special Counsel's name—'Mueller'—rather than his title."  373 F. Supp. 3d at 123, 125.  In *Pulliam*, DOJ "only used two search terms," and its declaration did "not 'explain the scope and method of the agency's search in a non-conclusory fashion,'" indicating the agency "did not understand the scope" of the request, 235 F. Supp. 3d at 193–94**.**  Finally, in *Avila*, "many components within the State Department used Agent Avila's name as the only search term" even though plaintiff requested "all records concerning Victor Avila, Jr." and "plainly [sought] information about the February 15, 2011 attack that severely wounded Agent Avila," and the State Department "knew Plaintiffs sought information about the attack."  2022 WL 2104483, at *1, 5–6 (emphasis omitted).  Unlike in *Judicial Watch*, *Pulliam*, and *Avila*, in all of which the agency's search failed to account for the scope of the request, *see Jud. Watch, Inc.*, 373 F. Supp. 3d at 125; *Pulliam*, 235 F. Supp. 3d at 194; *Avila*, 2022 WL 2104483, at *6 , here, the FBI employed nearly a dozen search terms calculated to "locate any potentially responsive communications," Seidel Decl. ¶ 26; Bender Decl. ¶¶ 13–14, which search, in fact, identified an investigative file that was beyond the scope of the request, *see* Seidel Decl. ¶ 19; Bender Decl. ¶ 5, and the FBI's declarations reasonably explained "the scope and method of the search conducted," *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982).

*Dep't of Health & Hum. Servs.*, No. 20-cv-1798 (BAH), 2021 WL 980895, at *13 (D.D.C. Mar. 16, 2021) (citations omitted).[8]

In short, plaintiff's "purely speculative claims about the existence and discoverability" of documents through alternate search terms does not overcome the "presumption of good faith" to which the FBI's conclusion regarding the adequacy of its search is entitled. *Shapiro*, 40 F.4th at 613–14 (upholding agency search against complaint that the FBI "search[ed] its card catalogues rather than leaf[ed] through every book in the library" because "an agency's search need only be 'reasonably expected to produce the information requested'" (quoting *Reps. Comm. for Freedom of Press*, 877 F.3d at 402); *Eddington v. U.S. Dep't of Def.*, 35 F.4th 833, 839 (D.C. Cir. 2022) ("[Plaintiff's] assertions . . . amount to 'purely speculative claims about the existence and discoverability' of his requests and are insufficient to overcome the presumption of good faith accorded to the [agency's] Declaration." (quoting *SafeCard Servs., Inc.*, 926 F.2d at 1200, and citing *Mobley*, 806 F.3d at 582)).

### D.  Other Communications Systems

Finally, plaintiff challenges as a shortcoming in the search scope that the FBI did not "search text messages and instant chat messages" or "explain why" such search was not conducted. Pl.'s Opp'n at 2. This critique is incorrect and simply ignores the FBI's explanation. In its initial and supplemental declarations, the FBI explained that "searches of the CRS would include a search for electronic communications, such as text messages and instant chat messages" that had been

---

[8]     Plaintiff cites *Nation Magazine, Washington Bureau v. U.S. Customs Service*, 71 F.3d 885, as support for a broader search, Pl.'s Opp'n at 8, but this case is inapposite. In that case, the FOIA request sought records "pertaining to Mr. [Ross] Perot," which together with appended materials, were deemed "sufficient to alert the agency that [plaintiffs] sought information about Perot, even if it was not indexed under his name." *Id.* at 888, 890. By contrast, here, plaintiff's FOIA request neither expressly states nor indicates that plaintiff sought records regarding the Biden diary theft investigation generally, nor did plaintiff attach any materials to its request otherwise informing the FBI that the request had such a broader scope beyond the explicit focus on the execution of the two search warrants in November 2021. *See* Seidel Decl. ¶ 6; Bender Decl. ¶ 12.

imported into CRS and "serialized," or "assigned a number in the order which the document [was] added to" the applicable investigative file, and that the FBI had "found no information indicating responsive records would likely reside in any other location" beyond those searched.  Bender Decl. ¶¶ 15–19; Seidel ¶¶ 15, 29; *see also* Def.'s Opp'n at 13.   The FBI's declarations accordingly explained that searches of text and instant chat messages "that [had] been serialized in the applicable investigative file" in CRS, Bender Decl. ¶ 18, "would have been redundant" of the FBI's searches of the CRS, *Clemente v. FBI*, 867 F.3d 111, 118 (D.C. Cir. 2017), and "our FOIA precedent, under which an agency's search need only be 'reasonably expected to produce the information requested,' does not require what the government represents would be a redundant search," *Shapiro*, 40 F.4th at 614 (quoting *Reps. Comm. for Freedom of Press*, 877 F.3d at 402). In any event, "[a]n agency need not 'search every record system,'" *Watkins L. & Advoc., PLLC*, 78 F.4th at 442 (quoting *Oglesby*, 920 F.2d at 68), "but only those records that are likely to have responsive documents"—as the FBI did here, *Porter v. C.I.A.*, 778 F. Supp. 2d 60, 69 (D.D.C. 2011) (citing *Oglesby*, 920 F.2d at 68); *see* Seidel ¶ 29; Bender Decl. ¶ 19.  Plaintiff's strained effort to tag the FBI as the source for the *NYT*'s reporting on the search warrants and reported publication of Project Veritas legal memoranda, *see supra,* at Part III.A, does not substantiate plaintiff's speculative hunch that responsive text or instant chat communications in fact exist.  *See Mobley*, 806 F.3d at 583 ("In the absence of any supporting evidence, [plaintiff's] argument that files predating his arrest must have existed [] fails to raise a material question of fact regarding the adequacy of the search.").

Moreover, plaintiff's assertion that a search of CRS would not have encompassed responsive text and instant chat messages because records classified as "transitory" pursuant to the FBI's record management policy may not have been entered into CRS, misses the point.  Pl.'s

Reply at 5.  Plaintiff offers no evidence to support its speculation that responsive text and instant chat messages exist, *see supra,* at Part III.A, and "[a]bsent some reason to believe that [text and instant chat messages] are likely to contain responsive materials, [plaintiff's] arguments are insufficient to require the FBI to conduct further searches," *Mobley v. C.I.A.*, 924 F. Supp. 2d 24, 44 (D.D.C. 2013), *aff'd, Mobley*, 806 F.3d 568).

Finally, plaintiff's singular reliance on *Reporters Committee for Freedom of the Press v. U.S. Department of Justice*, does not save plaintiff's challenge that the search is inadequate for failing to search individual FBI agents' texts and instant chat messages.  *See* Pl.'s Opp'n at 11; Pl.'s Reply at 5–6 (citing *Reporters Comm.*, No. 19-cv-2847 (TFH), 2021 WL 5179237 (D.D.C. Nov. 8, 2021)).  In that case, the FBI did not "search its email systems or other electronic messages," even though, in response to a separate FOIA request, "responsive emails were found [] in the exact location . . . indicated in Plaintiff's request." *Reporters Comm.*, 2021 WL 5179237, at *4.  On these facts, the search was easily found to be inadequate, given plaintiff's "affirmative proof that the FBI did not place a number of clearly responsive emails" in the CRS and that the FBI's "search methodology was . . . not 'reasonably calculated to uncover all relevant documents.'"  *Id.* at *4 (quoting *Valencia Lucena*, 180 F.3d at 325).  By contrast to *Reporters Committee*, plaintiff here has offered no indication, let alone "affirmative proof," that responsive text or instant chat messages were not captured by the FBI's search of the CRS.  *Id.*

Although the FBI's search "did not produce certain materials [plaintiff] believes exist and had hoped to find," "FOIA is not a wishing well; it only requires a reasonable search for records an agency actually has." *Clemente*, 867 F.3d at 118 (quoting *DiBacco v. U.S. Army*, 795 F.3d 178, 188, 190 (D.C. Cir. 2015)); *see also Watkins L. & Advoc.*, PLLC, 78 F.4th at 445 ("[T]he question . . . 'is not whether there might exist any other documents possibly responsive to the request, but

rather whether the search for those documents was adequate.'" (emphasis omitted) (quoting *Weisberg*, 745 F.2d at 1485)).  The FBI's search satisfies this standard.

## IV.   CONCLUSION

For the reasons stated, the Court concludes that "there is no genuine dispute as to any material fact," FED. R. CIV. P. 56(a), regarding the adequacy of the defendant's search for responsive records in response to the plaintiff's FOIA request.  Accordingly, the defendant's Motion for Summary Judgment is GRANTED, and plaintiff's Cross-Motion for Summary Judgment is DENIED.

An order consistent with this Memorandum Opinion will be entered contemporaneously.


Date:  November 27, 2023

_____
**BERYL A. HOWELL**
United States District Judge